SHORT, J.:
**28 In this divorce action involving cross-appeals, Debra Moore (Wife) appeals, arguing the family court erred in reducing the amount of her alimony. Lee Moore (Husband) also appeals, arguing the family court erred in (1) not sufficiently reducing his alimony obligation and (2) finding Husband presented no evidence to support his claim that Wife cohabitated for 90 consecutive days with her boyfriend and any periods of separation were intended to circumvent the 90-day rule. Both parties argue the court erred in awarding attorney's fees. We reverse and remand.
FACTS
Husband and Wife were divorced on July 15, 2003. Husband was ordered to pay Wife $3,800 per month in permanent periodic alimony. The parties agreed the amount of alimony was determined "by the circumstances of Husband having a gross yearly income of approximately $150,000" and allowed Wife "the right to earn up to $28,000 per year from employment without same being a change of circumstances as to her independent income status as affecting the issue of alimony."
On July 7, 2009, Husband filed an action seeking elimination or reduction of alimony. Husband stated he had changed jobs and was earning $130,000, which was comprised of a guaranteed base salary of $80,000 and commissions that were not guaranteed. Wife earned $20,789 in 2010. The parties reached an agreement to reduce Husband's alimony to $3,250 per month, beginning February 2011.
On July 29, 2013, Husband filed a second action seeking elimination or reduction of alimony. His request was based on a reduction in his income and Wife's continued cohabitation with a man she was romantically involved with. Husband asserted his current employment enabled him to earn up to **29 $80,000 per year. Wife asserted Husband was changing jobs for lower pay to avoid paying his alimony obligations. After a temporary hearing, the court found there had been a substantial change in Husband's circumstances that warranted reducing his alimony payments to $2,000 per month, beginning August 2013. A hearing was held April 1-2 and June 17, 2015. The court issued its final order on September 22, 2015. The court declined to terminate Husband's alimony obligation, but it reduced Husband's alimony obligation to $2,275. The court also ordered Husband to pay $10,000 of Wife's attorney's fees.
In October 2015, Wife and Husband filed separate motions to alter or amend the September 22, 2015 judgment. A hearing on the motions was held on November 30, 2015. The court issued its order on January 20, 2016, amending the September 22, 2015 order. In its order, the court further reduced Husband's alimony obligation to $1,800 per month. On February 9, 2016, the court issued a corrective order regarding the January 20, 2016 order. These appeals followed.
STANDARD OF REVIEW
On appeal from the family court, this court reviews factual and legal issues de *226 novo. Stoney v. Stoney , 422 S.C. 593, 594, 813 S.E.2d 486, 486 (2018) ; Lewis v. Lewis , 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. Stoney , 422 S.C. at 595, 813 S.E.2d at 487 ; Lewis , 392 S.C. at 384-85, 709 S.E.2d at 651-52. "[D]e novo standard of review does not relieve an appellant from demonstrating error in the [family] court's findings of fact." Lewis , 392 S.C. at 385, 709 S.E.2d at 652 (italics omitted). Thus, "the family court's factual findings will be affirmed unless [the] 'appellant satisfies this court that the preponderance of the evidence is against the finding of the [family] court.' " Id . at 392, 709 S.E.2d at 655 (quoting Finley v. Cartwright , 55 S.C. 198, 202, 33 S.E. 359, 360-61 (1899) ). **30 LAW/ANALYSIS
I. Husband's Appeal
Husband argues the family court erred in (1) not sufficiently reducing his alimony obligation and (2) finding Husband presented no evidence to support his claim that Wife cohabitated for 90 consecutive days with her boyfriend and any periods of separation were intended to circumvent the 90-day rule. We agree.
"Alimony is a substitute for the support normally incidental to the marital relationship." Crossland v. Crossland , 408 S.C. 443, 451, 759 S.E.2d 419, 423 (2014). "Generally, alimony should place the supported spouse, as nearly as is practical, in the same position he or she enjoyed during the marriage." Id. (quoting Allen v. Allen , 347 S.C. 177, 184, 554 S.E.2d 421, 424 (Ct. App. 2001) ).
South Carolina Code section 20-3-130(B)(1) (2014) provides that alimony terminates "on the remarriage or continued cohabitation of the supported spouse." " '[C]ontinued cohabitation' means the supported spouse resides with another person in a romantic relationship for a period of [90] or more consecutive days." S.C. Code Ann. § 20-3-130(B) (2014). Our courts have determined that a supporting spouse must prove by a preponderance of the evidence that a supported spouse continuously resided with a paramour for at least 90 consecutive days. See McKinney v. Pedery , 413 S.C. 475, 485, 776 S.E.2d 566, 571 (2015) ("[B]ecause [wife] sought termination of her alimony obligation to [husband], she bore the burden to show by a preponderance of the evidence that [girlfriend] resided with [husband] for at least [90] days."); Strickland v. Strickland , 375 S.C. 76, 89, 650 S.E.2d 465, 472 (2007) ("We find that the phrase 'resides with' in the context of § 20-3-150 sets forth a requirement that the supported spouse live under the same roof as the person with whom they are romantically involved for at least [90] consecutive days."). "The family court may also find 'that a continued cohabitation exists if there is evidence that the supported spouse resides with another person in a romantic relationship for periods of less than [90] days and the two periodically separate in order to circumvent the [90]-day requirement.' "
**31 McKinney , 413 S.C. at 487, 776 S.E.2d at 572-73 (quoting S.C. Code Ann. § 20-3-130(B) (2014) ).
Husband asserts the family court correctly determined there was a substantial change in his circumstances so that a modification of his alimony was necessary and that his changes in jobs and income were not purposefully intended to lower his alimony. However, he argues once the court found he had proven a substantial change in circumstances, the court should have imputed income to Wife when she had no legitimate basis for her not making efforts to become financially self-supporting since the parties' divorce and erred in imputing $90,000 income to Husband when he was making $60,000 at the time of the hearing.
Husband also asserts Wife lived with her boyfriend, Scott Erickson, but they separated before 90 days to avoid violating the statute. During the April 1, 2015 hearing, the parties' daughter, Stephanie Brown, testified she thought Wife lived with Erickson because when she went to Wife's house, there was furniture that belonged to Erickson, a different television, his clothes and shoes *227 were in a closet upstairs, a lot of Erickson's other belongings were in the house, he sometimes parked his car in her garage with the garage door closed, and Wife and Erickson were picking out paint colors for the house. She also testified Erickson moved bedroom furniture and a television with a video game system into a spare room for Erickson's son to play with when he was at the house. To her knowledge, Brown testified Erickson did not have anywhere else he stayed during the time she perceived he was living with Wife. However, in cross-examination, she testified she could not say for sure if Wife and Erickson lived together for more than 90 consecutive days in June 2013. She also stated she was not aware that Erickson maintained he had his own residence at that time and had put some of his belongings into storage. Brown testified Wife put pressure on her to not testify and told her if she was deposed, Wife "would know that we were choosing to side with [Husband] and that she didn't know if she would want a relationship with us anymore because she would feel like we were siding with him." Brown stated her relationship with Wife had not been good since her deposition in March 2014, and she currently did not have any contact with Wife. After the deposition, Wife told her daughters **32 they "threw her under the bus" with their testimony about Wife's living arrangements.
The parties' other daughter, Lauren Kott, testified she was at Wife's house on a daily basis in 2013. She stated Wife lived with Erickson from March to July 2013[1] , and they strategically planned nights apart so they were not together for 90 consecutive days - Erickson stayed at his parents' house for a night or Wife went on a running trip with her friends. Kott testified Wife and Erickson bought groceries together and he kept his food at her house; Erickson kept his furniture, clothes, shoes, toiletries, and his son's toys at Wife's house; Erickson purchased a new television for Wife's house; and Wife and Erickson were decorating together, including painting and selecting material to recover some chairs to match Erickson's furniture. Kott testified Erickson's son stayed the night at Wife's house. Kott also testified her daughter was moving clothes from Wife's washer to the dryer when she saw Erickson's underwear in the washer. Wife said she was doing some laundry for Erickson, and when Kott told Wife she knew Erickson was living there, Wife told her "not to say it too loud. She didn't want the girls to hear because they might tell [Husband]." Kott said Wife did not deny Erickson was living with her, and she smirked at the question. Kott also stated Erickson kept his car in Wife's garage. Kott testified Wife told her she tried to get her sister to take money from Erickson and write Wife a check so it would look like her sister was helping her pay her bills instead of her boyfriend. Wife also told Kott, "If you get deposed, I know whose side you're on, and don't expect a relationship with me." Kott testified that during her deposition, she answered only the "literal part" of the questions in an effort to protect Wife. Regardless, after her deposition, Wife yelled at Kott and Brown and said they "threw her under the bus." Kott, Brown, and Wife went to counseling after the depositions in March 2014 to help with their relationships. At the time of her testimony, Kott stated she had not had any contact with her mom, Wife, since their **33 attempts at counseling ended, and she lost her relationship with Wife because of her testimony.
Erickson testified he had a key to Wife's house; he moved his clothes, shoes, toiletries, and furniture into Wife's house; he moved some of his son's toys, a television, and a video game system into Wife's house for his son; and he took showers at her house. However, he denied living at Wife's house. Erickson admitted he was in a romantic relationship with Wife, and if his testimony had any impact on her maintaining her alimony, it would create a conflict in his relationship with Wife.
Wife's ex-fiancé, Andy Cromer, also testified. He stated he and Wife began living together in 2004 or early 2005. He testified he and Wife were living together when Husband filed an action to terminate alimony in *228 2009, and they lived together until the summer of 2011. Cromer testified that during his deposition, he gave vague answers because he was engaged to Wife and did not want to hurt her case against Husband. Wife told Cromer she did not want to get a full-time job because Husband should have to take care of her. Cromer said he and Wife had conversations about the 90-day rule, and Wife was well-versed in the South Carolina family court guidelines. Further, Wife's daughter Brown testified Wife told her "she knew she had to stay somewhere when she was with [Cromer], that she could not stay at his house 90 consecutive days because that was in their original divorce agreement." Brown testified that her perception was Wife lived with Cromer because she had things at his house, she was always there when she called, and they had family functions at his house. While we note Cromer's relationship pre-dates the February 2011 order adopting the parties' settlement agreement, we find it does show Wife had a pattern of separating to avoid the 90-day rule.
In McKinney , 413 S.C. at 485, 776 S.E.2d at 571-72, our supreme court noted "the facts indicate that Pedery and Hamby's living situation is a permanent arrangement of a romantic nature"; however, the court "focus[ed] on the specific requirement under the plain language of section 20-3-130(B)." "If the statute merely required the supported spouse to 'reside with' his paramour, then termination of McKinney's alimony **34 obligation would be proper. However, the statute mandates cohabitation for [90] consecutive days." Id. at 485-86, 776 S.E.2d at 572. "During the time in question, Hamby lived at her son's house in Duncan approximately two days of every week, which means that under a literal interpretation of the statute, Pedery and Hamby could not have lived 'under the same roof' for [90] consecutive days." Id. at 486, 776 S.E.2d at 572. Further, the supreme court found "McKinney presented no evidence that Pedery and Hamby periodically stayed apart from each other before the litigation began to circumvent the [90]-day requirement of section 20-3-130(B)." Id. at 488, 776 S.E.2d at 573.
The family court in this case found Husband did not carry his burden of proof to merit termination of alimony paid to Wife because Husband did not prove by a preponderance of the evidence that Wife cohabitated with a paramour for a period of 90 consecutive days. While it is true Husband did not present proof that Wife cohabitated with a paramour for a continuous period of 90 days, contrary to the family court we find he did present testimony that Wife intentionally separated from Erickson to avoid the 90-day requirement. After our de novo review, we find substantial evidence was presented in this case that Wife had a history of living with her boyfriends and separating to avoid the 90-day rule. See S.C. Code Ann. § 20-3-130(B) ("The court may determine that a continued cohabitation exists if there is evidence that the supported spouse resides with another person in a romantic relationship for periods of less than [90] days and the two periodically separate in order to circumvent the [90]-day requirement."). Therefore, we find the family court erred in not terminating Wife's alimony.
Husband also argues he is entitled to reimbursement for his alimony payments to Wife since the 2013 pendente lite order. He asserts he has paid Wife $52,500 in alimony and court costs from August 2013 through September 2015. Since September 2015, he asserts he has paid $19,800. In Butler v. Butler , 385 S.C. 328, 342-43, 684 S.E.2d 191, 198 (Ct. App. 2009), the family court required the former wife to reimburse her former husband for alimony payments, which was necessitated by a change in the former wife's circumstances. This court affirmed the decision to order the wife to reimburse the **35 husband for alimony payments; however, this court remanded the issue to the family court for clarification of whether the reimbursement related back to the husband's initial filing date or his amended filing date. Id. Therefore, we remand this issue to the family court to determine whether Husband is entitled to reimbursement from Wife for his alimony payments under Butler , and if so, how much money Wife must reimburse to Husband. *229 II. Wife's Appeal
Wife argues the family court erred in reducing Husband's alimony obligation. We find we do not need to reach this issue based on our determination that the family court erred in not terminating Wife's alimony. See Futch v. McAllister Towing of Georgetown, Inc. , 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of another issue is dispositive of the appeal).
III. Attorney's Fees and Costs
Wife and Husband both argue the family court erred in awarding attorney's fees and costs. Because we find Husband presented substantial evidence in this case that Wife had a history of living with her boyfriends and separating to avoid the 90-day rule, and therefore terminate Husband's alimony obligation, we reverse the family court's award of attorney's fees. We remand the issue to the trial court for a determination of fees based on our reversal.
CONCLUSION
We find the family court erred in not terminating Wife's alimony, and reverse and remand the case to the family court to determine whether Husband is entitled to reimbursement from Wife for his alimony payments. We also reverse the family court's award of attorney's fees and remand the case to the family court for a determination of fees based on our reversal.
REVERSED and REMANDED.
HUFF and WILLIAMS, JJ., concur.

Kott testified she first noticed Erickson's personal belongings in Wife's house at the beginning of March 2013, and she noticed his belongings were gone in September 2013. She said his belongings were definitely still at Wife's house in July 2013.